# Illinois Official Reports

## Appellate Court

***First Chicago Insurance Co. v. Molda*, 2015 IL App (1st) 140548**

| | |
|---|---|
| Appellate Court Caption | FIRST CHICAGO INSURANCE COMPANY, f/k/a Chicago Mutual Insurance Company, Plaintiff-Appellant, v. MICHAEL MOLDA and NOLA WILSON, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0548 |
| Filed | June 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CH-15285; the Hon. John Griffin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James P. Newman, of James P. Newman & Associates, of St. Charles, for appellant.<br><br>William Lazarus, of Lazarus Law Office, of Oakland, California, and Brian W. Coffman, of Coffman Law Offices P.C., of Chicago, for appellee Nola Wilson.<br><br>Beverly & Pause, of Chicago, for appellee Michael Molda. |

Panel    JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from the trial court's finding, after a bench trial, that plaintiff First Chicago Insurance Company (First Chicago) owed a duty to defend defendant Michael Molda in a personal injury lawsuit filed by Nola Wilson concerning an automobile collision between Molda and Wilson.[1] First Chicago appeals, arguing that Molda was not covered by the insurance policy at issue because he was not a covered party and that Molda failed to provide timely notice of his accident. For the reasons that follow, we affirm.

¶ 2                                   BACKGROUND

¶ 3    On May 24, 2008, First Chicago filed a complaint for declaratory judgment against Molda; Wilson; and Metrolift, Inc. (Metrolift), Molda's employer.[2] The complaint alleged that Molda was an employee of Metrolift and was involved in an automobile collision with Wilson on August 17, 2005, at the intersection of Roosevelt Road and 11th Avenue in Broadview. As a result of the collision, Wilson filed a lawsuit against Molda, later amending her complaint to name Metrolift as an additional defendant. At the time of Molda's accident, Metrolift was insured under an automobile liability insurance policy issued by First Chicago.

¶ 4    Count I of the complaint was entitled "Late Notice of Lawsuit," and alleged that, "[t]o the extent it is determined that MOLDA is an insured" under the First Chicago insurance policy, Molda was contractually obligated to forward any lawsuit papers to First Chicago " 'immediately.' " Count I alleged that Molda was served with the Wilson lawsuit on October 11, 2007, but First Chicago did not receive notice of the lawsuit until March 26, 2008. Count I further alleged that "[b]y failing to provide notice to [First Chicago] of the WILSON lawsuit immediately, MOLDA breached and violated the terms and conditions precedent to coverage under the [First Chicago] Policy." Accordingly, count I alleged that First Chicago owed no duty to defend or indemnify Molda in connection with the Wilson litigation and owed Wilson no monetary compensation under the First Chicago policy.

¶ 5    Count II of the complaint was entitled "Late Notice of Loss" and alleged that First Chicago's first notice of the August 17, 2005, accident was on March 26, 2008, and that "[b]y failing to provide notice to [First Chicago] of the August 17, 2005 accident promptly, METROLIFT and MOLDA breached and violated the terms and conditions precedent to coverage under the [First Chicago] Policy," which required prompt notice of any accidents. Accordingly, count II alleged that First Chicago owed no duty to defend or indemnify Metrolift or Molda in connection with the Wilson lawsuit and owed Wilson no monetary compensation under the First Chicago policy.

---

[1]Molda did not file a separate brief on appeal but adopted Wilson's brief.

[2]Metrolift was voluntarily dismissed on September 30, 2009, after agreeing to be bound by any final judgment in the matter.

- 2 -

¶ 6    Attached to First Chicago's complaint was a copy of the insurance policy at issue. The policy contained a list of nine categories of "covered autos," and the declarations page indicated that Metrolift had purchased liability insurance coverage for categories 7, 8, and 9. Category 7 was described as: "SPECIFICALLY DESCRIBED AUTOS. Only those autos described in ITEM FOUR for which a premium charge is shown (and for liability coverage for any trailers you don't own while attached to any power unit described in ITEM FOUR)." Category 8 was described as: "HIRED AUTOS ONLY. Only those autos you lease, hire, rent or borrow. This does not include any auto you lease, hire, rent, or borrow from any of your employees or members of their households." Category 9 was described as: "NONOWNED AUTOS ONLY. Only those autos you do not own, lease, hire or borrow which are used in connection with your business. This includes autos owned by your employees or members of their house-holds but only while used in your business or your personal affairs." The policy stated that the terms " 'you' and 'your' " referred to the named insured, in this case, Metrolift.

¶ 7    The policy stated that "[t]he following are 'insureds' " under the policy:

"a. You for any covered 'auto'.

b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow except:

(1) The owner or anyone else from whom you borrow a covered 'auto'. This exception does not apply if the covered 'auto' is a 'trailer' connected to a covered 'auto' you own.

(2) Your employee if the covered 'auto' is owned by that employee or a member of his or her household.

(3) Someone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is yours.

(4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered 'auto'.

(5) A partner of yours for a covered 'auto' owned by him or her or a member of his or her household.

c. Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability."

¶ 8    The policy also provided for "Duties in the Event of Accident, Claim, Suit or Loss":

"a. In the event of 'accident', claim, 'suit' or 'loss', you must give us or our authorized representative prompt notice of the 'accident' or 'loss'. Include:

(1) How, when and where the 'accident' or 'loss' occurred;

(2) The 'insured's' name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

b. Additionally, you and any other involved 'insured' must:

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the 'insured's' own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or 'suit'.

(3) Cooperate with us in the investigation, settlement or defense of the claim or 'suit'.

(4) Authorize us to obtain medical records or other pertinent information.

(5) Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require."

¶ 9       On October 13, 2009, Molda filed a counterclaim and third-party complaint for declaratory judgment. Count I was for "express indemnification" against First Chicago and requested, in the event that Wilson should prevail in her lawsuit against Molda, that judgment be entered against First Chicago "for the full amount of any such judgment plus costs, expenses and attorneys fees incurred by MICHAEL MOLDA." Count II was for "express and implied indemnification" against Metrolift and requested, in the event that Wilson should prevail in her lawsuit against Molda, that judgment be entered against Metrolift "for the full amount of any such judgment, plus costs, expenses and attorneys fees incurred by MICHAEL MOLDA."[3]

¶ 10      On February 26, 2010, the trial court granted summary judgment in favor of First Chicago, finding that Metrolift did not provide notice of the accident as required by the policy and, therefore, First Chicago did not have a duty to defend or indemnify Molda. Wilson and Molda appealed, and we reversed, finding that there were factual questions as to the adequacy of the notice. *First Chicago Insurance Co. v. Molda*, 408 Ill. App. 3d 839, 852-53 (2011).

¶ 11      On October 16, 2012, Molda filed a motion for summary judgment, and on October 23, 2012, Wilson also filed a motion for summary judgment. On February 8, 2013, the trial court denied all motions for summary judgment.

¶ 12      On January 13, 2014, the first day of trial, First Chicago filed an amended complaint for declaratory judgment. In addition to the late notice of loss and late notice of lawsuit counts that were included in the initial complaint, First Chicago's amended complaint also included a third count, alleging that "Molda Is Not an Insured as Defined by the FCIC Policy of Insurance." The amended complaint alleges that Molda was not operating a covered auto under the policy and was only an insured to the extent of Metrolift's liability; since there could be no liability against Metrolift, Molda was not an insured under the policy.

¶ 13      The parties proceeded to a bench trial on January 13, 2014. Stephen Harrison testified that he worked at Metrolift until 2011, where he was treasurer but "was basically CFO" and had "some operational responsibilities." Harrison testified that his daily responsibilities included "[a]ll administrative, banking, insurance, financial, accounting, and assist[ing] the president of the company, the owner with his day-to-day operations." Along with Richard Dahl, the owner of Metrolift, Harrison was in charge of insurance matters for Metrolift. Harrison testified that Metrolift had a number of insurance policies, including general liability, auto, and workers' compensation policies, through different insurance carriers.

¶ 14      Harrison testified that in procuring insurance for Metrolift, Metrolift often worked with an insurance broker, Mark Baskiewicz of Associated Specialty Insurance (Associated), who Harrison considered a "social friend[ ]." If there was an accident involving bodily injury that occurred and it involved a policy Metrolift had procured through Associated, Harrison "would call Mark and discuss with him whatever [Harrison] knew about it"; Harrison testified that he "had no experience in automobile accidents" and would rely on Associated. Harrison would

---

[3]Molda voluntarily dismissed count II as to Metrolift on February 9, 2010.

- 4 -

then complete an accident report and send Baskiewicz the accident report, police report, and any statements from the driver of the vehicle. After sending the information to Baskiewicz, "[d]epending on what I reviewed, if we thought a claim was going to evolve, I guess we would notify the insurance company. If not, we would just wait."

¶ 15    With regard to Molda's accident in 2005, Harrison recalled receiving notice of the accident "relatively quick[ly]." Harrison called Baskiewicz and discussed the accident with him, informing him of the details of the accident and that he believed Molda had his own insurance coverage since he was not driving a Metrolift vehicle. After speaking with Baskiewicz, "we decided jointly to wait to see whether or not a lawsuit was going to be filed against us, because it was happening during his lunch hour, and also because he had his own private insurance."

¶ 16    Harrison testified that at the time he spoke with Baskiewicz, he "believe[d] we were following the requirements of the policy, because he was our agent or broker. It was his job to let me know what was going on." He did not expect Baskiewicz to contact First Chicago as a result of their conversation.

¶ 17    Harrison testified that he was unaware at the time that First Chicago paid Associated bonus commissions based on claims and that, had he known, "[i]t surely would have seemed to affect [Baskiewicz's] judgment, it wouldn't have been quite as impartial where I would have been concerned."

¶ 18    One of the documents admitted into evidence at trial was a chain of emails between Harrison and Baskiewicz. The first email was a draft of a letter prepared by Harrison, which was sent to Baskiewicz. The letter was addressed to First Chicago's claims department and provided, in relevant part:

> "I, Stephen J. Harrison, corporate treasurer[,] notified Mark Baskiewicz of the incident involving Nola Wilson and Michael Molda on or near the date of the incident (August 17, 2005[)].
>
> Notification was via phone conversation. This statement is verified and confirmed by Mark Baskiewicz on the attached letter dated May 21, 2008.
>
> This notification procedure is consistent with Metrolift's course of dealing with Associated Specialty Insurance, both before and since the Wilson/Molda accident. I would notify Mark Baskiewicz of all accidents, incidents, claims, or losses covered under the insurance coverage provided through his agency. As the insurance company's authorized representative, I would convey to him the proper information as known to me at the time.
>
> Metrolift, Inc. has never had any direct contact with [First Chicago] with regarding [*sic*] applications for coverage, underwriting of coverage, issuance and delivery of policies and notification of accidents, claims, suits or losses. Mark Baskiewicz was the authorized representative of [First Chicago] for all these purposes. Thus all of our communications with [First Chicago] went through him."

¶ 19    The second email in the email chain was from Baskiewicz to Harrison, in response to the draft letter, and provided:

> "Everything looks good except you should leave off the part that you had no direct dealings with [First Chicago] auto as they billed you direct as well as for any endorsements and sent you the policies direct. There were even times when you guys

called them direct to make a payment. Everything else looks good !! When Kenny gets in, I will give him a copy of the letter as well."

¶ 20    John Gettemans testified at trial that he served as First Chicago's president from May 1989 to September 2013. He was also president of Insurance Concepts Enterprises, Inc., also known as the ICE Agency, from 1991 through April 2005. The ICE Agency was First Chicago's "marketing arm," and Associated was one of the ICE Agency's subproducers. The ICE Agency contracted to pay Associated bonus commissions contingent on First Chicago's profits; "[t]he more First Chicago made on its insurance business with Associated, the more it would pay Associated in commissions." Associated would lose its right to earn bonus commissions if the profitability of its book of business with First Chicago fell below a certain level. Additionally, Associated had a limited right to issue binding insurance on behalf of First Chicago; eligibility for binding authority was conditioned on maintaining a certain level of profitability on the insurance for First Chicago, referred to as the "loss ratio." Under the loss ratio, Associated could not keep its limited authority to bind First Chicago policies unless it maintained a loss ratio of less than 50%, nor would it receive bonus commissions unless the loss ratio was less than 50%.[4] First Chicago and the ICE Agency used an agent number to identify producers in order to calculate whether bonuses were earned; Associated's agent number, which appeared on Metrolift's insurance policy documents, was "001 ICE 015 Associate."

¶ 21    Gettemans testified that First Chicago "encouraged people to report [claims] to us, but if they felt more comfortable reporting to their agent, we encourage them to do so so it would be reported and their agent could report it to our people." On cross-examination, Gettemans admitted that "[i]f they do not report it directly," First Chicago "expressly authorized Metrolift to give notice of loss and notice of lawsuit to its agent Associated" at the time of Molda's accident in 2005. However, Gettemans testified that "it's still the duty of the agent to report the claim to the company. The company is the only authorized representative."

¶ 22    Molda testified that on August 17, 2005, at the time of the accident with Wilson, he was on his way to a construction site and was "performing [his] job duties for Metrolift." At the time of the accident, he was driving a 2001 Ford Taurus owned by his mother, Margo Clemmons; Molda did not reside with his mother. Molda testified that he was not offered a company vehicle to drive and was expected to use his own vehicle as part of his job duties as a salesman. Molda had insurance on the vehicle through State Farm, which had a $20,000 policy limit. Molda notified both State Farm and Metrolift after the accident. When Molda was served with Wilson's suit on October 11, 2007, he forwarded the papers to State Farm, which retained an attorney to represent him. Molda never had any communications with First Chicago. On cross-examination, Molda testified that he first learned of the existence of First Chicago and Metrolift's insurance coverage in 2008.

¶ 23    Mark Zintak testified at trial that he managed the special investigative unit and subrogation unit for First Chicago and had been employed by First Chicago since May 2005. Zintak testified that First Chicago first received notice of Molda's accident on March 26, 2008, when it received notice of Wilson's lawsuit. First Chicago received notice of the lawsuit from Associated; Molda never submitted anything to First Chicago. Zintak testified that insurance

---

[4]Under the producer contingency agreement, the loss ratio was calculated by dividing the loss and loss adjustment expense incurred by the net earned premiums.

cards issued by First Chicago would have First Chicago's name and contact information printed on the cards.

¶ 24 Zintak testified that it was important to receive prompt notice of an accident so that First Chicago would be able to conduct an "accurate investigation" of the claim, including speaking to all of the witnesses and parties involved and observing the "proximity of the damage," which could involve an accident reconstruction; in Molda's case, both vehicles were taken to a salvage yard, so observing the vehicles was not possible. Zintak further testified that "[m]ost important[ly]," Molda's vehicle contained an electronic data recovery system that could have provided information such as the speed of the vehicle at the time of the accident, whether Molda was wearing a seatbelt, and whether the brakes were engaged, "which would give us some documentation as to the cause of the accident and what happened." Zintak also testified that it was "very, very difficult" to examine the scene of the loss three years later and that "[i]n this case we wanted to talk to the owner of the vehicle to see if he had permission to drive the car, and if he was somehow using it in relation to business or on a personal matter."

¶ 25 Zintak testified that the only investigation he could perform as a result of the late notice was obtaining part of a police report indicating that the vehicle appeared to be owned by a "Marco Clemmons" residing at the same address as Molda, as well as checking insurance databases to discover any information available there. On cross-examination, Zintak admitted that he had never attempted to contact either Molda or Wilson to take their statements regarding the accident, nor did he attempt to contact the witness and police officer listed in the police report. Zintak further admitted that he did not attempt to obtain a copy of the title to the vehicle, which listed Margo Clemmons as the owner, but assumed that Marco Clemmons was the owner based on the police report.

¶ 26 On January 31, 2014, the trial court entered judgment in favor of defendants and against First Chicago and further "declare[d] that the applicable [First Chicago] policy of insurance entitles Molda to defense and indemnification relative to any and all claims of Wilson." The court found that, while Molda's vehicle was not a specifically described auto or a borrowed auto, it was a non-owned auto as defined by category 9 of the insurance policy. Additionally, the court found that "[t]he complaint filed by Wilson contained allegations which would trigger coverage of Molda, if said complaint was timely filed within the statute of limitations," and, accordingly, found that Molda was an insured under the policy.

¶ 27 The court found that, with respect to notice of the loss, "the evidence produced, including [First Chicago's] acquiescence under prior circumstances, the parties' practice of communication, and the declaration page of the policy, is sufficient to establish Associated's apparent authority" and further found that "the notice to Associated complied with the terms of the policy." The court also found that "[t]he failure of Associated to forward the notice to [First Chicago] does not amount to concealment or collusion as [to] notice to [First Chicago]," noting that "[t]here is no evidence of fraud." The court found that "[t]he evidence of Associated's 'bonus program' is insufficient to establish that it would be against the agent's interest to reveal the information to the principal," and also noted that Harrison testified that the reason that notice was not forwarded "was because they were not sure Molda was working or was at lunch at the time of the accident and Molda had his own insurance"; the court further noted that "Harrison believed he was following the terms of the policy and was relying on Associated." Consequently, the court found that the notice of the loss given under the policy "was prompt and reasonable."

¶ 28     With respect to notice of the lawsuit, the court found that "prompt notice of the occurrence was given. The insured was reasonably diligent in ascertaining whether coverage was available. Molda relied on Harrison who, in turn, relied on Baskiewicz. Finally, it cannot be said that [First Chicago] suffered any prejudice because the underlying case, Wilson v. Molda[,] has not advanced and [First Chicago] has not made any serious attempt to investigate this matter." The court also found that "while Harrison had some level of sophistication, he testified that he was 'not strong' in auto coverage, was more knowledgeable in general liability and relied on Baskiewicz. Molda was not sophisticated."

¶ 29     This appeal follows.

¶ 30                              ANALYSIS

¶ 31     On appeal, First Chicago argues that (1) Molda was not an insured under the insurance policy; (2) Associated was not the agent of First Chicago for purposes of providing notice; and (3) Molda did not provide timely notice of the loss.[5]

¶ 32                    I. Whether Molda Was an Insured

¶ 33     First Chicago first argues that the trial court erred in finding that Molda was an insured under the First Chicago insurance policy because (1) Molda's vehicle was not a covered auto under the policy and (2) Molda was not an insured as defined by the policy. The construction of a provision of an insurance policy is a question of law that we review *de novo*. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 451 (2009). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 14. "A court's primary objective in construing an insurance contract is to ascertain and give effect to the intention of the parties as expressed in the agreement." *Addison*, 232 Ill. 2d at 455. "An insurance contract will be liberally construed in favor of the insured." *Addison*, 232 Ill. 2d at 455.

¶ 34     As an initial matter, we must address defendants' argument that this issue has already been decided by this court and, therefore, the law of the case doctrine bars relitigation of the issue. "[T]he law of the case doctrine bars relitigation of an issue previously decided in the same case." *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006). However, the issue of whether Molda was an insured under the First Chicago policy was not decided by this court in the earlier appeal. In our previous consideration of the instant case, when we were reviewing the trial court's grant of summary judgment in First Chicago's favor, our recitation of the facts included the statement that "[u]nbeknownst to Molda, as a Metrolift employee, he was also covered under Metrolift's insurance policy with First Chicago." *First Chicago*, 408 Ill. App. 3d at 840. We also noted, in a footnote, that "Molda's automobile was owned by Margo Clements, his mother, but the ownership of the vehicle does not affect Molda's coverage under the First Chicago policy." *First Chicago*, 408 Ill. App. 3d at 840 n.3. These statements do not reflect a decision on the issue of whether Molda was an insured under the policy. The case at that point was focused solely on the issue of notice; in fact, First Chicago did not amend its complaint to include an allegation that Molda was not an insured under the policy until January 13, 2014, the first day of trial. We cannot find that two passing references concerning

[5]We note that First Chicago does not argue on appeal that Molda failed to provide timely notice of the lawsuit.

- 8 -

something that would not become an issue in the case until nearly three years after our decision in any way reflects that the issue was "previously decided" by this court.

¶ 35 Turning to the merits of First Chicago's argument, under the First Chicago policy, First Chicago agreed to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto,' " and also owed the "right and duty to defend any 'insured' against a 'suit' asking for such damages." Thus, to be eligible for coverage, Molda must have been considered an insured and must have been using a covered auto at the time of his accident.

¶ 36                    A. Whether the Vehicle Was a Covered Auto

¶ 37 With respect to the question of whether Molda's vehicle was a covered auto, Metrolift purchased insurance coverage for three categories of autos–categories 7, 8, and 9. The parties agree that categories 7 and 8 do not apply, but disagree as to whether Molda's vehicle was included in category 9. Category 9 was described as: "NONOWNED AUTOS ONLY. Only those autos you do not own, lease, hire or borrow which are used in connection with your business. This includes autos owned by your employees or members of their house-holds but only while used in your business or your personal affairs."

¶ 38 Molda testified at trial that at the time of the accident, he was driving a 2001 Ford Taurus owned by his mother, Margo Clemmons, and further testified that he did not reside with Clemmons. First Chicago argues that Molda's vehicle would have been covered only if the vehicle was owned by Molda or someone in his household and also argues that there was no evidence that the vehicle was being used in Metrolift's business. We do not find this argument persuasive.

¶ 39 First Chicago argues that in order to give effect to all provisions of the policy, category 9 must be read to limit nonowned autos to only those vehicles owned by an employee or member of the household and that "[i]f Non Owned auto was meant to be so broad to include *any* automobile not owned by METROLIFT (as defendants suggest), then other provisions of the policy would be improperly rendered superfluous." (Emphasis in original.) However, First Chicago's interpretation of the definition of nonowned autos is overly restrictive. Under the plain language of the definition of nonowned auto, a vehicle is covered if (1) it is not owned, leased, hired or borrowed by Metrolift and (2) it is used in connection with Metrolift's business. After that basic definition, the policy makes clear that vehicles not owned, leased, hired or borrowed by Metrolift but owned by its employees would be entitled to coverage if used in connection with Metrolift's business. The limitation of the definition to those autos used in connection with Metrolift's business prevents the category from being so broad as to render other provisions superfluous, as First Chicago suggests.[6]

¶ 40 We do not find persuasive First Chicago's attempt to invoke "the 'well-known maxim of construction, *inclusio unius est exclusio alterius*, or the inclusion of one is the exclusion of the other.' " *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1018 (2011) (quoting *Schanowitz v.*

---

[6]We note that this limitation distinguishes it from category 1, which provides coverage for "any 'auto,' " which appears to be the provision that First Chicago argues would be rendered superfluous. Category 1 does not require that the auto be used in connection with Metrolift's business in order to be covered.

*State Farm Mutual Automobile Insurance Co.*, 299 Ill. App. 3d 843, 848 (1998)). Despite First Chicago's contention that the last sentence of the definition "clearly limits" the category to only those vehicles owned by the employee or member of his or her household, the last sentence does not contain any language of limitation, other than the requirement that the vehicle be used in connection with Metrolift's business, which is a limitation applicable to the category as a whole. Instead, the last sentence makes explicit the *inclusion* of a category of vehicles that otherwise could have been questionable.

¶ 41 We also note that, although not cited by either party, we have reached this same conclusion before in *Pekin Insurance Co. v. Benson*, 306 Ill. App. 3d 367 (1999), under remarkably similar circumstances. In that case, the defendant was involved in an accident while driving a vehicle owned by her mother, who did not reside with the defendant. *Pekin*, 306 Ill. App. 3d at 371. The plaintiff insurance company denied coverage, claiming that the defendant's vehicle was not a " 'nonowned auto,' " which was defined as " '[a]ny "auto" you do not own, lease, hire, rent, or borrow used in connection with your garage business described in the Declarations. This includes "autos" owned by your employees or partners or members of their households while used in your garage business.' " *Pekin*, 306 Ill. App. 3d at 371. On appeal, the insurer contended that "the second sentence of the definition limits its coverage to autos owned by the insured's employees, partners, or members of their households used in connection with the insured's business." *Pekin*, 306 Ill. App. 3d at 372.

¶ 42 We rejected the insurer's arguments, noting that "a commonsense reading of the language 'any auto' in the first sentence of the definition combined with the insurance contract's purpose of extending coverage to anyone occupying a 'covered auto' support[ed] the trial court's interpretation" of " 'nonowned auto' " as including any auto the insured did not own, lease, hire, rent, or borrow. *Pekin*, 306 Ill. App. 3d at 372. Furthermore, we agreed with the trial court that "the second sentence of the 'nonowned auto' definition constitute[d] an amplification or illustration of the general definition." *Pekin*, 306 Ill. App. 3d at 372. See also *Pekin*, 306 Ill. App. 3d at 373 (stating that "the second sentence does not contain any meaningless phrases but provides guidance as to what may constitute a 'nonowned auto' "). We did not find persuasive the insurer's arguments that the word " 'includes' " was intended to be a limitation of coverage, finding that, at most, there were competing interpretations of the word, and pointing out that "the second sentence of the definition does not state, 'This *only* includes employees or partners, or members of their household.' " (Emphasis in original.) *Pekin*, 306 Ill. App. 3d at 373. Accordingly, we found that the trial court properly found that the defendant's vehicle was a " 'nonowned auto' " under the insurance policy. *Pekin*, 306 Ill. App. 3d at 374.

¶ 43 The language interpreted by the court in *Pekin* is almost identical to that at issue in the present case with respect to the issue of whether the vehicle was a covered auto under the policy. There, a " 'nonowned auto' " was defined as " '[a]ny "auto" you do not own, lease, hire, rent, or borrow used in connection with your garage business described in the Declarations. This includes "autos" owned by your employees or partners or members of their households while used in your garage business.' " *Pekin*, 306 Ill. App. 3d at 371. Similarly, here, category 9 was described as: "NONOWNED AUTOS ONLY. Only those autos you do not own, lease, hire or borrow which are used in connection with your business. This includes autos owned by your employees or members of their house-holds but only while used in your business or your personal affairs." The *Pekin* court's reading of that language as including the

employee's mother's vehicle provides support for our reaching of a similar conclusion in the instant case.

¶ 44    In the case at bar, Molda's vehicle was not owned, leased, hired or borrowed by Metrolift. Accordingly, if it was used in connection with Metrolift's business, then it would be a covered auto under category 9.

¶ 45    First Chicago argues that there was no evidence that Molda's vehicle was used in connection with Metrolift's business. However, Molda testified that on August 17, 2005, at the time of the accident with Wilson, he was on his way to a construction site and was "performing [his] job duties for Metrolift." Molda further testified that in his capacity as a sales representative, he was never given a company vehicle to drive and it was his understanding that as part of his job duties, he needed to drive his own vehicle and Metrolift was aware that he was driving his own vehicle. First Chicago argues that this evidence "is nothing but a conclusion and proves nothing, and thus has no evidentiary value." However, it is for the trial court to determine the weight a witness's testimony should receive. *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995). Additionally, the vehicle was only required to be used "in connection with" Metrolift's business, a term that has been construed as being broad as well as vague, meaning that it must be construed strictly against the insurer. *Hartford Fire Insurance Co. v. Whitehall Convalescent & Nursing Home, Inc.*, 321 Ill. App. 3d 879, 889 (2001). In the case at bar, through Molda's testimony, defendants provided evidence that Molda was operating the vehicle in connection with First Chicago's business, and accordingly, Molda's vehicle was properly considered to be a "nonowned auto" under the First Chicago policy.

¶ 46    We find unpersuasive First Chicago's reliance on *Kinney v. Continental Assurance Co.*, 42 Ill. App. 3d 263 (1976), as support for its argument that the evidence presented at trial through Molda's testimony is insufficient to demonstrate that he was operating the vehicle in connection with Metrolift's business. *Kinney* involves quite different issues than those present in the case at bar, as well as different factual circumstances. In that case, the court was considering the question of whether the defendant was acting within the scope of his employment at the time of the accident at issue so as to give rise to vicarious liability. The court noted that "the general rule of law is that accidents which occur while an employee is going to or from his employment do not arise out of or in the course of his employment" (*Kinney*, 42 Ill. App. 3d at 266 (citing *Burmeister v. Industrial Comm'n*, 52 Ill. 2d 84, 86 (1972)), and found that the defendant "was on his own time, on his own errand, in his own automobile" (*Kinney*, 42 Ill. App. 3d at 266). Consequently, the *Kinney* court found that the trial court correctly determined that the defendant's employer was not vicariously liable for the defendant, since the defendant was not acting within the scope of his employment at the time of the accident. *Kinney*, 42 Ill. App. 3d at 266-67.

¶ 47    In the case at bar, the trial court was not asked to determine whether Metrolift would be vicariously liable for Molda's actions. Instead, the insurance policy merely required Molda to be operating the vehicle "in connection with" Metrolift's business. As we noted, this is a term that has been construed as being broad as well as vague, meaning that it must be construed strictly against the insurer. *Hartford*, 321 Ill. App. 3d at 889. Furthermore, unlike the defendant in *Kinney*, who "was on his own time, on his own errand, in his own automobile" (*Kinney*, 42 Ill. App. 3d at 266), Molda testified that he was traveling to a job site as part of his job duties as a salesman for Metrolift, duties that required him to drive his own vehicle. Accordingly, we cannot find that it was against the manifest weight of the evidence for the trial court to find that

- 11 -

the vehicle Molda was operating was a "nonowned auto" under the First Chicago policy.

¶ 48                    B. Whether Molda Was an "Insured" Under the Policy Language

¶ 49      First Chicago also argues that Molda was not an insured as defined by the First Chicago policy. Metrolift was the named insured under the policy and the policy further provided that "[t]he following are 'insureds' " under the policy:

"a. You for any covered 'auto'.

b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow except:

(1) The owner or anyone else from whom you borrow a covered 'auto'. This exception does not apply if the covered 'auto' is a 'trailer' connected to a covered 'auto' you own.

(2) Your employee if the covered 'auto' is owned by that employee or a member of his or her household.

(3) Someone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is yours.

(4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered 'auto'.

(5) A partner of yours for a covered 'auto' owned by him or her or a member of his or her household.

c. Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability."

Molda does not qualify as an insured under either paragraph (a) or (b), since he was not the named insured and the vehicle he was driving was not owned, hired or borrowed by Metrolift. Accordingly, the only way that Molda would be covered by the policy would be if paragraph (c) applied.

¶ 50      We agree with the trial court that Molda qualifies as an insured under paragraph (c). Under that paragraph, Molda would be considered an insured if he was liable for the conduct of Metrolift, but only to the extent of that liability. First Chicago argues that since all of the claims against Metrolift were dismissed, Metrolift has no liability for the accident and, consequently, Molda cannot be considered an insured since he would be an insured "only to the extent of [Metrolift's] liability." However, First Chicago's argument overlooks the fact that " '[q]uestions of applicable coverage can be determined only as of the time of the accident creating potential liability.' " *Gaudina v. State Farm Mutual Automobile Insurance Co.*, 2014 IL App (1st) 131264, ¶ 26 (quoting *Coley v. State Farm Mutual Automobile Insurance Co.*, 178 Ill. App. 3d 1077, 1081 (1989)). See also *Hawkeye Security Insurance Co. v. Sanchez*, 122 Ill. App. 3d 183, 186 (1984). At the time of the accident, Metrolift had potential liability under the doctrine of *respondeat superior*, and, in fact, was included as a defendant in Wilson's case on that basis.[7] If Wilson obtained a judgment against Metrolift under the theory of *respondeat superior*, Metrolift would be entitled to indemnification from Molda under the common law theory of quasi-contractual implied indemnity. *Gibbs v. Top Gun Delivery & Moving Services,*

_____

[7]The count against Metrolift was dismissed on statute of limitations grounds, a decision that was affirmed on appeal. *Wilson v. Molda*, 396 Ill. App. 3d 100 (2009).

- 12 -

*Inc.*, 399 Ill. App. 3d 765, 772 (2010); *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill. 2d 347, 353-54 (1992). Consequently, at the time of the accident, Molda was "liable for the conduct of an 'insured' described above but only to the extent of that liability," and, therefore, qualified as an insured under the First Chicago policy.

¶ 51                    II. Whether Associated Was First Chicago's Agent

¶ 52     First Chicago next argues that the trial court erred in finding that Associated was First Chicago's agent for purposes of accepting notice. "Generally, the question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003). "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo*, 164 Ill. 2d at 214. "The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Bazydlo*, 164 Ill. 2d at 214-15. Consequently, we will not reverse the trial court's judgment unless it is against the manifest weight of the evidence. *Farmers Automobile Insurance Ass'n v. Gitelson*, 344 Ill. App. 3d 888, 891-92 (2003). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo*, 164 Ill. 2d at 215.

¶ 53     In the case at bar, the trial court found that "the evidence produced, including [First Chicago's] acquiescence under prior circumstances, the parties' practice of communication, and the declaration page of the policy, is sufficient to establish Associated's apparent authority." We cannot find this conclusion to be against the manifest weight of the evidence.

¶ 54     As we noted in our prior decision, defendants' argument that proper notice was given relies on the theory that notice to an agent is imputed to its principal. In the insurance context, an insurance broker is generally considered to be the agent of the insured and not the insurance company unless the agent is a general agent of the insurance company. *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 431 (1991); *Founders Insurance Co. v. White*, 367 Ill. App. 3d 883, 888 (2006); *Young v. Allstate Insurance Co.*, 351 Ill. App. 3d 151, 162 (2004); *Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.*, 138 Ill. App. 3d 574, 582 (1985). However, there are situations in which an insurance broker can act as the agent of the insurance company or even as the agent of both the insured and the insurance company. *Burgos*, 145 Ill. 2d at 431; *Empire Fire & Marine Insurance Co. v. Faith Truck Lines, Inc.*, 178 Ill. App. 3d 356, 359 (1988). Additionally, even if the broker does not have the actual authority to act as the insurer's agent for notice, it may have apparent authority to do so. *Burgos*, 145 Ill. 2d at 431. See also *Long v. Great Central Insurance Co.*, 190 Ill. App. 3d 159, 165-66 (1989); *Empire*, 178 Ill. App. 3d at 359-60; *Mitchell Buick*, 138 Ill. App. 3d at 583; *American Home Assurance Co. v. City of Granite City*, 59 Ill. App. 3d 656, 663 (1978); *State Security Insurance Co. v. Goodman*, 6 Ill. App. 3d 1008, 1011-12 (1972); *Boston Store of Chicago v. Hartford Accident & Indemnity Co.*, 227 Ill. App. 192, 203-04 (1922); 13 Couch on Insurance 3d § 187:73 (1999); 11 Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 68.8 (1996).

- 13 -

¶ 55 Apparent authority is that authority which a reasonably prudent person would naturally suppose the agent to possess, given the words or conduct of the principal. *Burgos*, 145 Ill. 2d at 431-32. "It is a well-established precept of agency law that a principal will be bound by the authority he *appears* to give to another, as well as that authority which he actually gives." (Emphasis in original.) *Burgos*, 145 Ill. 2d at 431 (citing *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 426 (1980)). Once the principal has created the appearance of authority, he is estopped from denying it to the detriment of a third party. *Burgos*, 145 Ill. 2d at 432. To establish apparent agency, the party alleging the existence of the agency must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal; (2) the principal had knowledge of and acquiesced in the acts of the agent; and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18.

¶ 56 The apparent authority of an insurance broker to act as an agent of the insurance company for notice can be established through the course of dealings between the broker and the insurance company. *Burgos*, 145 Ill. 2d at 432. "Where an insurer's manner of dealing with the broker in regard to the insured would lead the insured to believe that the broker had the authority to perform the acts in question, the insurer is estopped to deny the broker's authority to perform those acts." *Burgos*, 145 Ill. 2d at 432. Moreover, acquiescence in the insurance broker's conduct by the insurance company under prior circumstances is sufficient to establish the broker's apparent authority. *Burgos*, 145 Ill. 2d at 432.

¶ 57 In the case at bar, there was evidence presented at trial supporting the trial court's conclusion that Associated was First Chicago's agent for purposes of accepting notice. Examining the policy itself, as we noted in our prior case, the policy required that, "[i]n the event of 'accident', claim, 'suit' or 'loss', you must give us or our authorized representative prompt notice of the 'accident' or 'loss'." The First Chicago policy included Associated's name, address, and telephone number on its declarations page as the producer. It did not provide any other contact information, nor was any individual or business other than Metrolift named anywhere within the policy. If a claim was to be made, there was no reference to a phone number or person in his representative capacity to contact other than "our authorized representative." Additionally, in payment schedules admitted into evidence, Associated's information is listed under the underlined heading "Agent" and an "Agent Number" is provided under Associated's information.

¶ 58 Gettemans, president of First Chicago at the time of Molda's accident, testified that First Chicago "encouraged people to report [claims] to us, but if they felt more comfortable reporting to their agent, we encourage them to do so so it would be reported and their agent could report it to our people." On cross-examination, Gettemans admitted that "[i]f they do not report it directly," First Chicago "expressly authorized Metrolift to give notice of loss and notice of lawsuit to its agent Associated" at the time of Molda's accident in 2005. However, Gettemans testified that "it's still the duty of the agent to report the claim to the company. The company is the only authorized representative."

¶ 59 Harrison, who was responsible for Metrolift's insurance, testified that if there was an accident involving bodily injury that occurred and it implicated a policy Metrolift had procured through Associated, Harrison "would call Mark [Baskiewicz] and discuss with him whatever

[Harrison] knew about it"; Harrison testified that he "had no experience in automobile accidents" and would rely on Associated. Harrison would then complete an accident report and send Baskiewicz the accident report, police report, and any statements from the driver of the vehicle. After sending the information to Baskiewicz, "[d]epending on what I reviewed, if we thought a claim was going to evolve, I guess we would notify the insurance company. If not, we would just wait." With regard to Molda's accident in 2005, Harrison recalled receiving notice of the accident "relatively quick[ly]." Harrison called Baskiewicz and discussed the accident with him, informing him of the details of the accident and that he believed Molda had his own insurance coverage since he was not driving a Metrolift vehicle. After speaking with Baskiewicz, "we decided jointly to wait to see whether or not a lawsuit was going to be filed against us, because it was happening during his lunch hour, and also because he had his own private insurance." Harrison testified that at the time he spoke with Baskiewicz, he "believe[d] we were following the requirements of the policy, because he was our agent or broker. It was his job to let me know what was going on."

¶ 60    The chain of emails between Harrison and Baskiewicz that was admitted at trial also supported Harrison's testimony that he communicated solely with Baskiewicz concerning claims. The first email was a draft of a letter prepared by Harrison, which was sent to Baskiewicz. The letter was addressed to First Chicago's claims department and provided, in relevant part:

> "I, Stephen J. Harrison, corporate treasurer[,] notified Mark Baskiewicz of the incident involving Nola Wilson and Michael Molda on or near the date of the incident (August 17, 2005[)].
>
> Notification was via phone conversation. This statement is verified and confirmed by Mark Baskiewicz on the attached letter dated May 21, 2008.
>
> This notification procedure is consistent with Metrolift's course of dealing with Associated Specialty Insurance, both before and since the Wilson/Molda accident. I would notify Mark Baskiewicz of all accidents, incidents, claims, or losses covered under the insurance coverage provided through his agency. As the insurance company's authorized representative, I would convey to him the proper information as known to me at the time.
>
> Metrolift, Inc. has never had any direct contact with [First Chicago] with regarding [*sic*] applications for coverage, underwriting of coverage, issuance and delivery of policies and notification of accidents, claims, suits or losses. Mark Baskiewicz was the authorized representative of [First Chicago] for all these purposes. Thus all of our communications with [First Chicago] went through him."

Upon receiving the draft letter, Baskiewicz emailed Harrison with his approval.

¶ 61    In summary, the evidence at trial demonstrated that (1) First Chicago admittedly encouraged policyholders to report claims to their insurance agent if they felt more comfortable doing so; (2) First Chicago's policy documents and payment schedules either provided only Associated's contact information or expressly referred to Associated as "Agent"; and (3) Metrolift's course of dealings with Associated and First Chicago involved contacting Associated, not First Chicago, whenever there was a potential insurance claim. We cannot find that it was against the manifest weight of the evidence for the trial court to conclude that this evidence gave rise to apparent agency for the purpose of accepting notice.

¶ 62     We find First Chicago's arguments to the contrary to be unpersuasive. First Chicago argues that there was no reliance on Molda's or Wilson's behalf, which is necessary for a finding of apparent agency. However, as will be further discussed below, it is Metrolift that was responsible for providing notice to First Chicago, and Harrison testified that Metrolift relied on Associated to ensure compliance with the First Chicago policy. First Chicago further argues that there must be evidence that First Chicago " 'had knowledge of and acquiesced in the acts of the agent (Associated),' " and identifies the " 'act' " at issue as Associated's failure to inform First Chicago of the accident. However, the "acts of the agent" for our purposes are the acts of purportedly accepting notice on behalf of First Chicago. As explained above, there was evidence presented that First Chicago was aware that Associated was accepting notice on its behalf and in fact encouraged that behavior for policyholders that did not wish to notify First Chicago directly. Finally, First Chicago points to statements of Harrison indicating that Metrolift considered Associated to be Metrolift's agent, not First Chicago's. However, as noted, there are situations in which an insurance broker can act as the agent of the insurance company or even as the agent of both the insured and the insurance company. *Burgos*, 145 Ill. 2d at 431; *Empire Fire & Marine Insurance Co.*, 178 Ill. App. 3d at 359. Thus, references to Associated as Metrolift's agent do not preclude the trial court's finding that it was also acting as First Chicago's apparent agent.

¶ 63                              III. Whether Notice Was Timely

¶ 64     Finally, First Chicago argues that the trial court erred in finding that the notice of the accident was timely and also argues that defendants breached the notice of loss provision by conspiring to withhold information from First Chicago. We note that First Chicago does not argue on appeal that notice of the lawsuit was untimely, but solely focuses on notice of the accident itself. Generally, the timeliness of notice given pursuant to an insurance policy is a question of fact for the trier of fact. *University of Illinois v. Continental Casualty Co.*, 234 Ill. App. 3d 340, 363 (1992). "Where, as here, the trial court heard witness testimony and made a factual determination, its decision will not be reversed unless it is against the manifest weight of the evidence." *Illinois Founders Insurance Co. v. Barnett*, 304 Ill. App. 3d 602, 607 (1999). As noted, "[a] judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo*, 164 Ill. 2d at 215.

¶ 65     A notice provision in an insurance contract is a "valid prerequisite[ ]" to coverage under the policy. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006); *Berglind v. Paintball Business Ass'n*, 402 Ill. App. 3d 76, 85 (2010) ("notice provisions are not merely technical requirements but, rather, conditions precedent to the triggering of the insurer's contractual duties"). "Provisions in policies stating when the insurer must be notified of a covered occurrence have generally been interpreted to require notification of the company within a reasonable time, considering all the facts and circumstances of the particular case." *American Family Mutual Insurance Co. v. Blackburn*, 208 Ill. App. 3d 281, 288 (1991); *Barrington Consolidated High School v. American Insurance Co.*, 58 Ill. 2d 278, 281 (1974). "Whether notice has been given within a reasonable time depends on the facts and circumstances of each case." *Livorsi Marine*, 222 Ill. 2d at 311-12.

¶ 66     In the case at bar, First Chicago argues that it did not receive notice from Metrolift until March 2008, approximately 31 months after the accident, which it claims violates the notice

provision of the policy as a matter of law. We rejected this exact argument in our earlier decision, and First Chicago has provided no reasons why we should depart from our earlier holding, even citing the same cases that we found unpersuasive in their previous case. *First Chicago*, 408 Ill. App. 3d at 851-52.

¶ 67 Moreover, as noted, the reasonableness of notice is a fact-specific inquiry. *Livorsi Marine*, 222 Ill. 2d at 311-12. "Factors the courts may consider in determining reasonable notice include: (1) the specific language of the policy's notice provisions; (2) the degree of the insured's sophistication in the world of commerce and insurance; (3) the insured's awareness that an occurrence as defined under the terms of the policy has taken place; (4) the insured's diligence and reasonable care in ascertaining whether policy coverage is available once the event has occurred; and (5) any prejudice to the insurance company." *Berglind v. Paintball Business Ass'n*, 402 Ill. App. 3d 76, 86 (2010) (citing *Livorsi Marine*, 222 Ill. 2d at 313).

¶ 68 First Chicago argues that defendants cannot argue that Metrolift was an unsophisticated insured because Metrolift knew it was required to provide notice to First Chicago and chose not to do so. However, Harrison testified that he had no experience in the area of automobile insurance and relied on Associated to ensure Metrolift was complying with the First Chicago policy. First Chicago also argues that it was not required to show prejudice in a late notice of loss defense, but that it nevertheless demonstrated that it had been prejudiced by the delay by the inability to conduct the investigation it otherwise would have. First Chicago is correct that "*once it is determined that the insurer did not receive reasonable notice* of an occurrence or a lawsuit, the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer." (Emphasis added.) *Livorsi Marine*, 222 Ill. 2d at 317. However, while our supreme court has expressly rejected the notion that prejudice is a dispositive requirement in determining whether reasonable notice was provided (see *Livorsi Marine*, 222 Ill. 2d at 316-17 ("even if there is no prejudice to the insurer, a policyholder still must give reasonable notice according to the terms of the insurance policy")), it has instructed that in making the determination of whether a policyholder's notice is reasonable, "the presence or absence of prejudice to the insurer is one factor to consider." *Livorsi Marine*, 222 Ill. 2d at 317. Thus, First Chicago's contention that it was not required to show prejudice is incorrect in this situation, where the reasonableness of the notice is to be determined. First Chicago's reliance on the appellate decision in *Livorsi Marine* is inapplicable, because there, the parties agreed that the notice provided by the insureds was unreasonable. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 358 Ill. App. 3d 880, 884 (2004).

¶ 69 In the case at bar, the trial court found that "it cannot be said that [First Chicago] suffered any prejudice because the underlying case, Wilson v. Molda[,] has not advanced and [First Chicago] has not made any serious attempt to investigate this matter." First Chicago argues that the "undisputed evidence" showed that "[b]ecause of the late notice, [First Chicago] was not able to inspect the vehicle, talk to witnesses when the facts were fresh, or really conduct any meaningful investigation at all." However, Zintak testified that he had not obtained the entire police report, did not attempt to obtain a copy of the vehicle's title, did not interview either Wilson or Molda, and did not attempt to interview either the witness or the police officer listed in the police report. In addition, there is no showing whether Zintak contacted State Farm to learn what their investigation discovered. We agree with the trial court that this demonstrates that First Chicago "has not made any serious attempt to investigate this matter,"

and does not show that First Chicago was prejudiced. Thus, the trial court's finding that notice was reasonable was not against the manifest weight of the evidence.

¶ 70 Furthermore, we have concluded above that the trial court properly determined that Associated was First Chicago's apparent agent for purposes of accepting notice of the loss. Associated was notified of the loss almost immediately, and First Chicago does not argue that the notice provided to Associated was unreasonable. Accordingly, the trial court's conclusion that notice was timely was not against the manifest weight of the evidence.

¶ 71 First Chicago argues that the notice to Associated cannot be imputed to First Chicago because both Metrolift and Associated agreed not to provide the notice to First Chicago. Again, this is an argument that we considered and rejected in our earlier decision, and First Chicago does not provide any reason for us to depart from our earlier holding. *First Chicago*, 408 Ill. App. 3d at 849-50. There, we noted that the cases First Chicago relied on to support its argument that notice to an agent is not imputed to a principal when the facts support the inference that the agent will conceal the information from the principal were all cases in which the agent was concealing information due to fraud or because it would be against the agent's interest to reveal the information to the principal. *First Chicago*, 408 Ill. App. 3d at 850 (citing *Neagle v. McMullen*, 334 Ill. 168, 181 (1929), *Merchants' National Bank of Peoria v. Nichols & Shepard Co.*, 223 Ill. 41, 53 (1906), *Tesluk v. Metropolitan Life Insurance Co.*, 130 Ill. App. 2d 290, 294-95 (1970), and *Woodlawn Farm Co. v. Farmers & Breeders Livestock Insurance Co.*, 227 Ill. App. 577, 583-84 (1923)). We further noted that the facts present in those cases cited indicated that the concealment occurred at the time of the application for the insurance policy. *First Chicago*, 408 Ill. App. 3d at 850 (citing *Tesluk*, 130 Ill. App. 2d at 295 (notice was not imputed to principal when insured was aware that agent did not include information regarding nervous breakdown on application because it would " 'confuse the matter' ")). As we noted there, these cited cases do not include the situation that occurred here; Associated did not have an adverse interest to First Chicago that would result in its being in Associated's best interest not to provide notice, nor was there any fraud in the Metrolift's application for the policy or in their conduct.

¶ 72 Furthermore, all of the evidence was presented to the trial court as the trier of fact, and the trial court determined that there was no evidence of fraud and that there was insufficient evidence that it would be against Associated's interest to reveal the information to First Chicago. We cannot find that this decision was against the manifest weight of the evidence, and, accordingly, affirm the trial court's judgment in favor of defendants.

¶ 73                                                    CONCLUSION

¶ 74 For the reasons set forth above, we find that (1) Molda was an insured under the terms of the First Chicago insurance policy, (2) the trial court did not err in finding Associated to be the apparent agent of First Chicago for purposes of accepting notice, and (3) the trial court did not err in finding notice of Molda's accident to be timely.

¶ 75 Affirmed.