2024 IL App (1st) 221769

No. 1-22-1769

Opinion filed August 7, 2024

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| STONEGATE INSURANCE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CH 7627 |
| | ) | |
| ALL CITY TOWING, INC.; AUTO CLUB GROUP; | ) | Honorable Celia G. Gamrath |
| GERARDO SANCHEZ; and DANIEL GALBRAITH, | ) | and Thaddeus L. Wilson, |
| | ) | Judges, presiding. |
| Defendants-Appellees. | ) | |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices D.B. Walker and R. Van Tine concurred in the judgment and opinion.

**OPINION**

¶ 1    This case centers on a dispute over insurance coverage between defendants All City
Towing, Inc. (ACT), a towing company, and Auto Club Group (ACG), a roadside assistance
provider, and plaintiff Stonegate Insurance Company (Stonegate). The dispute arose from a
physical altercation between a tow truck driver and one of ACG's customers. Plaintiff sought
declaratory relief regarding both its duty to defend and indemnify ACT, the insured party. The trial
court entered summary judgment in favor of ACT on both questions and subsequently ordered

plaintiff to pay ACT $179,215.39. Plaintiff now appeals, claiming that the trial court erred in finding that it had a duty to defend and indemnify ACT.

¶ 2    For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 3                          I. BACKGROUND

¶ 4    The factual background of this appeal involves three different trial court actions: a negligent hiring action involving a battery, a counterclaim for contribution and indemnification, and an action seeking a declaratory judgment. The latter of the three gave rise to this appeal, but the context for all three is necessary to an understanding of this case.

¶ 5                          A. The Battery

¶ 6    On February 1, 2016, Daniel Galbraith filed a negligence suit against ACG and ACT. Galbraith alleged that on June 11, 2014, he contacted ACG for the purpose of obtaining roadside assistance. Per its contractual relationship with ACG, ACT dispatched a tow truck driver, Gerardo Sanchez, to provide assistance to Galbraith. Galbraith alleged that Sanchez arrived and "confronted [Galbraith] and simultaneously exerted with great force such physical contact with [Galbraith]." Galbraith claimed that ACG and ACT were negligent in their hiring, training, and management of Sanchez. However, Sanchez was not named in the lawsuit. A criminal battery prosecution was initiated against Sanchez, and at a court date on July 8, 2014, Sanchez was arrested for threatening Galbraith inside the courthouse. ACG subsequently settled with Galbraith for $100,000. In a written order on December 16, 2019, the trial court found that the settlement was

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

fair and completely resolved all of Galbraith's claims against ACG and ACT. Pursuant to the settlement, the trial court dismissed Galbraith's suit with prejudice.

¶ 7                                    B. The Counterclaim

¶ 8      ACG filed a three-count counterclaim against ACT on July 7, 2017, and ACG filed an amended counterclaim on October 6, 2020. ACT, represented by counsel retained by plaintiff, did not file an answer to that amended counterclaim. Count II of the amended counterclaim alleged that ACT's contract with ACG required it to indemnify ACG for the $100,000 settlement, as well as fees, costs, and expenses incurred defending Galbraith's suit.

¶ 9      On March 16, 2021, ACG moved for summary judgment on the contractual indemnification count. ACT did not oppose that motion. The trial court granted that motion on July 20, 2021, and ultimately awarded ACG $166,266.19 based on the indemnification claim, attorney fees, expenses, costs, and accrued prejudgment interest. Counts I and III were voluntarily dismissed.

¶ 10                              C. The Declaratory Judgment Action

¶ 11    Prior to Galbraith's litigation, ACT was insured by plaintiff and had purchased that insurance policy through an agent, National Insurance Group (National). After being served with Galbraith's complaint, ACT's president, Mohannad Khairallah, notified National of Galbraith's suit. On March 22, 2016, shortly after the filing of Galbraith's suit, plaintiff acknowledged its receipt of Galbraith's complaint in a letter to ACT. The letter stated that plaintiff had retained counsel to defend ACT in Galbraith's suit and that plaintiff reserved the right to deny coverage to ACT based on a failure to notify and cooperate with plaintiff regarding the June 11, 2014, incident.

¶ 12    On June 6, 2016, plaintiff filed a complaint for a declaratory judgment against ACG, ACT, Galbraith, and Sanchez. Plaintiff subsequently filed a first, second, and third amended complaint. The third amended complaint was filed on July 23, 2018. Count I of the third amended complaint sought a declaratory judgment that plaintiff's "business auto" coverage, which covered injuries caused by an accident resulting from maintenance or use of a covered vehicle, did not apply to Galbraith's suit. Count II sought a similar declaratory judgment that plaintiff's "garage operations" coverage also did not apply to Galbraith's lawsuit. That count also claimed that ACT never provided any information to plaintiff about the incident with Galbraith and Sanchez and therefore breached the policy's notice provision. Finally, count III sought a declaratory judgment that Stonegate was not obligated to pay anything to ACT on public policy grounds. In its answer, ACG conceded that plaintiff's "business auto" coverage did not apply.

¶ 13                          D. Summary Judgment

¶ 14    On September 23, 2019, plaintiff filed a motion for summary judgment, arguing that its insurance did not apply to the Galbraith suit because (1) ACT violated the policy's requirement that it provide prompt notice of an accident, (2) negligent hiring was not an "accident" contemplated by the insurance policy, and (3) Sanchez's actions were intentional and thus excluded from the policy. ACG responded with a cross-motion for summary judgment seeking a declaration that plaintiff had a duty to defend and indemnify ACT in the Galbraith suit.

¶ 15    On October 30, 2020, the trial court granted both motions for summary judgment in part. It found that plaintiff's "business auto" coverage did not apply to the Galbraith suit, but also found that the "garage operations" policy imposed on plaintiff a duty to defend ACT in the Galbraith

suit. The trial court reserved ruling on whether plaintiff had a duty to indemnify ACT because the underlying counterclaim against ACT was not yet resolved.

¶ 16    On March 8, 2022, after the judgment on ACG's counterclaim against ACT was entered, ACG moved for summary judgment on plaintiff's duty to indemnify ACT. Plaintiff filed a response on March 29, 2022. The trial court granted summary judgment in favor of ACG on October 31, 2022.

¶ 17    On November 18, 2022, ACG filed a petition for further relief pursuant to section 2-701(c) of the Code of Civil Procedure (735 ILCS 5/2-701(c) (West 2022)) seeking judgment against plaintiff in the amount of the judgment against ACT plus accrued interest, totaling $179,215.39.

¶ 18    While that petition was pending, plaintiff filed a notice of appeal on November 22, 2022, appealing the two summary judgment orders entered on October 30, 2020, and October 31, 2022. On May 1, 2023, the trial court granted ACG's petition and entered judgment in ACG's favor for $179,215.39. Plaintiff did not file a notice of appeal from that judgment.

¶ 19                    E. The Stonegate Insurance Policy

¶ 20    On September 22, 2013, plaintiff issued its policy to ACT. The portion of the policy relevant to this case covered "Garage Operations—Other Than Covered Autos." That coverage provided:

> "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies caused by an 'accident' and resulting from 'garage operations' other than the ownership, maintenance or use of covered 'autos.' We have the right and duty to defend any 'insured' against a 'suit' for these damages."

¶ 21 The policy set out a number of circumstances where coverage would not apply. These included (1) bodily injury or property damage that is, from the perspective of the insured, expected or intended; (2) liability assumed under a contract or agreement, except when that contract or agreement is an "insured contract"; and (3) bodily injury to a person arising out of a refusal to employ that person, termination of that person's employment, or "employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or malicious prosecution directed at that person." Finally, the policy set out that plaintiff had no duty to provide coverage unless the insured provided prompt notice of an accident or loss, cooperated with any investigations, and immediately provided plaintiff with copies of any request, demand, order, notice, or summons.

¶ 22                                    II. ANALYSIS

¶ 23 Plaintiff now argues on appeal that the trial court erred in its summary judgment orders finding that it had a duty to both defend and indemnify ACT.

¶ 24 Accordingly, we subdivide our discussion of the issues into those claims of error directed at the trial court's summary judgment finding that plaintiff had a duty to defend ACT and the trial court's summary judgment finding that plaintiff had a duty to indemnify ACT.

¶ 25 The construction of a provision of an insurance policy is a question of law that we review *de novo*. *First Chicago Insurance Co. v. Molda*, 2015 IL App (1st) 140548, ¶ 33. A court's primary objective in construing an insurance contract is to ascertain and give effect to the intention of the parties as expressed in the agreement. *Id.* We liberally construe insurance contracts in favor of the insured. *Id.* We also review *de novo* the trial court's rulings on motions for summary judgment. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 8 (2004). Summary judgment is appropriate when the

pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.*; 735 ILCS 5/2-1005(c) (West 2022). Summary judgment should not be granted unless the right of the moving party is clear and free from doubt. *Horwitz*, 212 Ill. 2d at 8.

¶ 26                                    A. Summary Judgment: Duty to Defend

¶ 27    Plaintiff raises multiple arguments in support of the claim that it had no duty to defend ACT, which we address in turn. An insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy. *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 869 (2000). If the allegations in the underlying complaint fall within or even potentially within the policy's coverage, the insurer's duty to defend arises. *Id.*

¶ 28                                    1. Coverage Under "Garage Operations"

¶ 29    Plaintiff first argues that the trial court erred in finding a duty to defend on the part of plaintiff because Sanchez's conduct did not fall within the definition of "garage operations" in the policy. But plaintiff's argument is grounded in a theme that recurs throughout its brief—a bizarre, fantastical insistence that the *only* conduct at issue here was Sanchez's battery, and its refusal to accept that the allegations in Galbraith's complaint were targeted at ACT's conduct in the form of negligent hiring, training, and management of Sanchez.

¶ 30    The policy stated that it would pay for bodily injury or property damage caused by an accident resulting from "garage operations" other than the ownership, maintenance, or use of covered "autos." It defined "garage operations" as "the ownership, maintenance, or use of locations for garage business and that portion of the roads or other accesses that adjoin these

locations." Garage operations also "include[d] all operations necessary or incidental to a garage business."

¶ 31 Plaintiff cites four cases in support of its argument that a negligent hiring claim based on a battery cannot invoke insurance coverage. The first, *Laycock v. American Family Mutual Insurance Co.*, 289 Ill. App. 3d 264, 265-67 (1997), involved an automotive liability insurance policy and an altercation between two drivers and had nothing to do with a negligent hiring claim following an intentional tort.

¶ 32 The remaining three cases are also so factually distinguishable as to be inapposite. In *United States Fidelity & Guaranty Co. v. Jiffy Cab Co.*, 265 Ill. App. 3d 533, 535 (1994), a cab driver got into an argument with one of his passengers and ultimately stabbed the passenger, killing him. The insurer of the cab company sought declaratory relief that its automotive liability policy did not cover the stabbing and it had no duty to defend. *Id.* at 536. The policy in question stated, " 'We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.' " *Id.* at 538. We held that the insurer had no duty to defend and that the negligent hiring claim failed to invoke coverage by an automotive liability policy. *Id.* at 540-42.

¶ 33 In *American Country Insurance Co. v. Chicago Carriage Cab Corp.*, 2012 IL App (1st) 110761, ¶ 1, a cab driver ignored the passenger's requested destination and instead drove the passenger to a location to be robbed. The passenger sued the cab company for negligent entrustment, and the insurance company filed a declaratory judgment action to absolve it of any responsibility to pay damages after a jury found in favor of the passenger and against the cab

company. *Id.* ¶¶ 2, 12-13. There, the insurance policy also covered "damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " (Internal quotation marks omitted.) *Id.* ¶ 13. We held that summary judgment in the declaratory judgment action was properly granted because the passenger's injuries " 'did not arise out of the ownership, maintenance, or use of an auto.' " *Id.* ¶ 36.

¶ 34     Finally, in *SCR Medical Transportation Services, Inc. v. Browne*, 335 Ill. App. 3d 585, 586 (2002), the driver of a van service for disabled passengers, who was a convicted felon, sexually assaulted a woman in the van and in her home. While the woman sued the transportation company and the driver for, among other things, negligent hiring, the company's insurance provider filed a declaratory judgment action claiming it had no duty to defend. *Id.* The insurance policy at issue, like the previous two cases, covered property damage and bodily injury "caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " (Internal quotation marks omitted.) *Id.* at 587. The court held that the insurer had no duty to defend because there was no nexus between the accident or injury and the ownership, use, or maintenance of the vehicle. *Id.* at 589.

¶ 35     The common thread between these cases relied upon by plaintiff is that they involved intentional torts or criminal acts where there was no link between the act and the use, maintenance, or ownership of a covered automobile. In this case, however, the issue is not coverage for an automotive liability policy. We note that during the litigation below, the parties agreed that the policy's "business auto" liability coverage did not apply.

¶ 36    Instead, the relevant question is whether the allegations of Galbraith's suit fell within, or potentially fell within, the definition of "garage operations." The trial court here reasoned that "hiring and supervision of employees is part and parcel of the operation of every business," and we agree. The hiring, training, and management of employees is undoubtedly necessary or incidental to a garage business because they are inseparable from the way in which the business exercises business judgment. See *National Fire Insurance Co. of Hartford v. Kilfoy*, 375 Ill. App. 3d 530, 536 (2007) (allegations of negligent hiring and supervision went "to the heart" of the insured's business operations).

¶ 37    Accordingly, the trial court did not err in concluding that Galbraith's allegations of negligent hiring fell within the policy's definition of "garage operations."

¶ 38                                2. Intended Injury Exclusion

¶ 39    Plaintiff next argues that the policy's "expected or intended injury" exclusion compels reversal. The policy contains an exclusion for "Bodily injury or property damage expected or intended from the standpoint of the insured."

¶ 40    The policy defined "insured" as "any person or organization qualifying as an insured in the Who Is an Insured provision of the applicable coverage." Plaintiff insists that this exclusion barred coverage because Sanchez was "an insured" and because Galbraith "made claims against Sanchez and ACT." The first problem with plaintiff's argument is that it is not factually accurate. Galbraith never sued Sanchez, and no amount of claiming that Galbraith filed suit over a battery can make it true.

¶ 41    Additionally, *American Family Mutual Insurance Co. v. Enright*, 334 Ill. App. 3d 1026, 1030 (2002), dealt with a similar insurance provision which excluded intentional injury expected

or intended from the standpoint of the insured. In the underlying tort, a woman sued a medical practice for negligent hiring and one of its employees for battery, alleging that the employee had sexually assaulted her. *Id.* The court held that the employee's intentional act was separate and distinct from the negligent hiring by the medical practice. *Id.* at 1031-32. The court also stated:

> "[W]e cannot adopt a general rule of law that holds that coverage is not invoked for an employer simply because the policy does not cover the employee for his intentional act. If we were to do so, we would ignore the independent negligent act of the employer that gave rise to the allegation in the underlying complaint. We also would disregard the clear intent of the policy to exclude intentional conduct on the part of the 'insured.' " *Id.* at 1033.

¶ 42　In the present case, the "insured" from the perspective of the underlying tort complaint was ACT because that was the entity being sued and seeking coverage, not Sanchez. Like *Enright*, holding that Sanchez's intentional act eliminated coverage would eliminate the distinction between Sanchez's battery and ACT's negligent hiring which gave rise to the complaint. See *id.*

¶ 43　Plaintiff also argues that we should reverse the judgment of the trial court because *Professional Solutions Insurance Co. v. Karuparthy*, 2023 IL App (4th) 220409, "not only compels reversal but comprehensively rejects the analysis" done by the trial court. With respect to this comment, plaintiff's brief does not identify any specific part or parts of the trial court's summary judgment orders with which it takes issue, and we will not guess or speculate as this court is "not simply a depository into which the appealing party may dump the burden of argument and research." (Internal quotation marks omitted.) *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205. However, the portion of plaintiff's argument that is explicitly stated centers around accusing

defendants, without any factual support, of collusively turning Galbraith's suit into a negligence case to involve insurance coverage when Galbraith should have sued Sanchez for a battery.

¶ 44    *Karuparthy*, however, is significantly distinguishable. In *Karuparthy*, an underlying tort arose after a doctor treated a patient with a substance that immobilized her, and the doctor subsequently grabbed, fondled, and kissed his patient without her consent. *Karuparthy*, 2023 IL App (4th) 220409, ¶ 1. The patient sued the doctor and his employer for medical negligence. *Id.* While the tort complaint was pending, the doctor pled guilty to multiple criminal offenses. *Id.* ¶¶ 2, 20. The doctor's insurance company subsequently filed a complaint for declaratory relief, alleging that it had no duty to defend the doctor because the underlying tort case alleged intentional conduct that triggered the insurance policy's exclusion for criminal acts. *Id.* ¶¶ 2, 22. The trial court ultimately dismissed the declaratory relief action and found that the insurance company had a duty to defend. *Id.* ¶ 39.

¶ 45    The appellate court reversed, reasoning that "[a]ny lay person reading the allegations of the underlying complaint as a whole would easily understand that [the plaintiff] seeks to recover for injuries resulting from a single course of conduct—namely, [the doctor's] sexual misconduct under the guise of medical treatment." *Id.* ¶ 61. The court stated that the underlying tort plaintiffs

> "ask[ed] this court to elevate legal labels over the substance of the factual allegations in the underlying complaint, thereby permitting plaintiffs to manufacture coverage through clever lawyering, careful wording, and sophisticated pleading, all calculated to neatly comply with black-letter law and legal rules in a purely abstract, hyper-technical sense while ignoring reality and common sense." *Id.* ¶ 59.

¶ 46    *Karuparthy* is inapposite. The instant case is not one where the underlying plaintiff, Galbraith, attempted to transmute an intentional tort, Sanchez's battery, into an act of negligence so that it could make ACT vicariously liable. Instead, Galbraith's suit alleged negligent hiring against ACT and did not name Sanchez as a defendant. Galbraith's suit was not, as in *Karuparthy*, seeking to recover from "a single course of conduct" that was the underlying intentional tort. Sanchez's battery may have been the injury, but the course of conduct that preceded that intentional tort took the form of ACT and ACG's negligence in hiring, training, and managing their employees. See *Montgomery v. Petty Management Corp.*, 323 Ill. App. 3d 514, 519 (2001) (under theory of negligent hiring, the proximate cause of the plaintiff's injury is the employer's negligence in hiring the employee, rather than the employee's wrongful act).

¶ 47    The instant case is different from *Karuparthy* because negligent hiring or negligent supervision cases are distinct from vicarious liability. *Young v. Lemons*, 266 Ill. App. 3d 49, 52 (1994). Plaintiff's reading of *Karuparthy* is so broad that it would preclude any negligent hiring claims that arise out of the intentional acts of employees. That is an absurd reading of *Karuparthy*, as claims for negligent hiring based on the intentional or criminal conduct of an employee are a well-recognized cause of action. See, *e.g.*, *Doe v. Coe*, 2019 IL 123521, ¶¶ 41-46 (holding that plaintiffs stated a claim for negligent hiring of youth pastor who sexually assaulted minors by alleging that cursory Internet search would have notified church of pastor's sexual interest in children).

¶ 48    Accordingly, we reject plaintiff's argument that the policy's "intended injury" exclusion precluded coverage. The trial court did not err in its interpretation of the policy.

¶ 49                              3. Employer's Liability Exclusion

¶ 50    Plaintiff next argues that the policy's "employer's liability" exclusion applied to the incident with Galbraith, and therefore plaintiff had no duty to defend. That exclusion states that the policy does not apply to bodily injury to "a person arising out of employment-related practices, policies, acts, or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, or malicious prosecution directed at that person."

¶ 51    In response, defendant points out that plaintiff's complaint for declaratory relief did not plead this exclusion. Plaintiff raised this exclusion for the first time in its motion for summary judgment, and it is improper to grant summary judgment on a basis not contained within the pleadings. See *Gold Realty Group Corp. v. Kismet Café, Inc.*, 358 Ill. App. 3d 675, 679-80 (2005); *Pagano v. Occidental Chemical Corp.*, 257 Ill. App. 3d 905, 911 (1994).

¶ 52    This is because a plaintiff "fixes the issues in controversy and the theories upon which recovery is sought by the allegations in his complaint." *Pagano*, 257 Ill. App. 3d at 911. Once a plaintiff fails to seek a particular form of relief, a "plaintiff will not be heard to complain that summary judgment was inappropriately granted because of the existence of evidence supporting a theory of recovery that he never pled in his complaint." *Id.*

¶ 53    Despite plaintiff's failure to plead the exclusion, the language of the policy indicates that this exclusion was meant to apply to employees of the insured party. The policy states that this exclusion applies whether the injury-causing event "occurs before employment, during employment or after employment of that person." This makes it clear that the "person" referred to in the exclusion itself must be a future, current, or past employee.

¶ 54    Accordingly, the trial court did not err in its summary judgment order because plaintiff did not plead this exclusion and, even if it had, it did not apply.

¶ 55                                    4. Reasonable Notice

¶ 56    Plaintiff further argues that it had no duty to defend ACT because ACT failed to comply with the policy's notice provision. In particular, plaintiff argues that ACT breached the notice provision of its insurance policy because no one from ACT notified plaintiff of the incident involving Galbraith and Sanchez.

¶ 57    When analyzing whether an insured provided reasonable notice to the insurer, we consider four factors: (1) the language of the notice condition; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; and (4) the insured's diligence in ascertaining whether policy coverage is available. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 313 (2006). Whether the insurer suffered prejudice may also be a factor, but lack of prejudice is not a condition which will eliminate the requirement of reasonable notice. *Id.* at 316 (citing *Simmon v. Iowa Mutual Casualty Co.*, 3 Ill. 2d 318, 322 (1954)).

¶ 58    The first factor looks to the language of the insurance policy's notice provision. Here, the policy required ACT to provide "prompt notice" of an accident or loss to plaintiff or its authorized representative. It also required ACT to "immediately" send plaintiff copies of any "request, demand, order, notice, summons, or legal paper received" regarding a claim or lawsuit. There was no dispute in the facts presented for summary judgment that Khairallah went to the scene to retrieve the tow truck, but did not speak to Galbraith, or even know who he was. He had no knowledge that anyone was hurt, and therefore did not think there was anything to report to plaintiff. Galbraith

himself admitted in an affidavit that he never communicated with ACT or ACG regarding the incident and made no claim for damages before filing the suit. It was also undisputed that, upon being served with Galbraith's suit, Khairallah contacted his agent at National, who forwarded the complaint to plaintiff. ACT provided notice when it received Galbraith's suit, and until that time Khairallah did not know there was anything to report. Under the circumstances, the notice was as prompt as it could be.

¶ 59    The second factor is the insured's level of sophistication with insurance matters. Khairallah's deposition testimony established that ACT was a one-person company, with a number of tow truck drivers employed as independent contractors. There was no one employed at ACT as a "risk manager" nor anyone "in charge of insurance matters." Khairallah personally had no formal training in insurance matters. Although Khairallah owned ACT, he testified that it was not his primary source of employment and that prior to Galbraith's suit he had been working another job because he needed health insurance for his family. Khairallah also testified that ACT had been involved in a prior lawsuit over an accident that resulted in an injury, but he was unsure when it occurred—it was possibly more than 10 years prior to his deposition. Khairallah had never seen a copy of his insurance policy before, which he surmised was because he had never asked for a copy.

¶ 60    This factor also weighs in favor of ACT. Khairallah was the sole employee of ACT and had no special training dealing with insurance, nor any employees specialized in that area. His experience with tort litigation was limited to one other incident that was remote in time, and ACT was not his primary employment. Nothing indicates that Khairallah had any special insight or knowledge in insurance or tort matters such that he could have foreseen there was a reason to contact plaintiff prior to Galbraith's lawsuit.

¶ 61    The third factor is the insured's awareness of an event which may trigger insurance coverage. As we have already noted, Khairallah had no knowledge that anyone had been injured and Galbraith never contacted ACT prior to filing suit. Khairallah learned he was accused of negligently hiring Sanchez only after being served with the lawsuit. This factor weighs in favor of ACT having no awareness of an event triggering coverage until it was served a copy of Galbraith's lawsuit.

¶ 62    The final factor is ACT's diligence in determining whether coverage is available. The trial court did not explicitly contemplate this factor, nor does plaintiff argue that this factor weighs in plaintiff's favor. Nevertheless, ACT did not attempt to ascertain the existence of coverage prior to Galbraith's lawsuit because, as we have noted, it was not initially clear to Khairallah that anything had transpired that necessitated such an inquiry. But once he received Galbraith's lawsuit, he involved his insurer as required.

¶ 63    An insured's duty to notify its insurer arises on the day when the insured received information regarding an accident that potentially was covered under the insurance policy. *Fletcher v. Palos Community Consolidated School District No. 118*, 164 Ill. App. 3d 921, 927 (1987). The insured has a duty to give timely notice to the insurer if the circumstances of an occurrence would suggest to a reasonably prudent person that a claim for damages covered by the policy might be asserted against the insured. *National Bank of Bloomington v. Winstead Excavating of Bloomington*, 94 Ill. App. 3d 839, 842 (1981). In sum, the *Livorsi* factors weigh in favor of the conclusion that ACT provided reasonable notice to plaintiff. Khairallah forwarded the lawsuit to his insurance agent when he received it, and the agent subsequently provided the lawsuit

to plaintiff. Prior to that moment, based on what Khairallah knew, there was nothing for a reasonably prudent person to report.

¶ 64    Additionally, we can consider whether plaintiff suffered any prejudice based on the fact that Khairallah provided notice when he did. Daniel Adelman, plaintiff's president, testified at his deposition that plaintiff had not discovered any facts that were previously concealed by ACT and he did not know whether ACT had misrepresented any facts. He also could not identify any specific prejudice Stonegate had suffered with respect to defending against Galbraith's lawsuit.

¶ 65    On this subject, plaintiff argued that the trial court misapplied the law by concluding, in plaintiff's words, that "ACT having never given notice of the claim didn't matter because of a putative lack of prejudice." Plaintiff also claims that the trial court "wrongly elevated 'material prejudice' to the sole requirement inherent in a no or late notice Declaratory action." Plaintiff has interpreted the trial court's order as concluding that ACT provided no notice, but the lack of prejudice nevertheless absolved ACT of its obligation to notify plaintiff. Even being charitable to plaintiff, this is a tortured reading of the trial court's order. The trial court first concluded that the *Livorsi* factors weighed in favor of ACT, including that ACT was reasonably diligent in its response to Galbraith's lawsuit. It then reasoned, "In considering the reasonableness of the notice, a factor to be considered is whether any prejudice to that insurer occurred as a result of a delay. [Internal citation omitted.] Although a lack of prejudice will not defeat an argument that notice was untimely, it is significant to note that there is no indication whatsoever of any prejudice to Stonegate by [ACT's] purported delay."

¶ 66    The trial court's reasoning is consistent with *Livorsi*. It considered the prejudice to plaintiff as part of its analysis of whether Khairallah's notice to plaintiff about the lawsuit was reasonable;

it did not use a lack of prejudice to dispose of the requirement of notice in a case where none was given—because that is not this case.

¶ 67    In sum, ACT provided reasonable notice to plaintiff and did not breach the notice provision in the insurance policy. The trial court did not err in concluding that ACT complied with the policy's requirements.

¶ 68                           B. Summary Judgment: Duty to Indemnify

¶ 69    Having determined that the trial court properly granted summary judgment in favor of defendants as to plaintiff's duty to defend, we turn to plaintiff's remaining argument that the trial court erred in also finding that plaintiff had a duty to indemnify ACT. Plaintiff argues that its policy did not apply to Galbraith's lawsuit because the "Garage operations" policy contained an exclusion for "liability assumed under any contract or agreement." On June 6, 2014, ACT and ACG entered into a "Roadside Assistance Contract." This agreement required ACT to indemnify ACG for "any and all losses, costs and expenses" related to willful, wanton, or negligent acts of ACT or ACT's employees and required ACT to assume "the entire responsibility and liability for any and all losses."

¶ 70    The policy at issue also contained an exception for that exclusion when the damages are those "[a]ssumed in a contract or agreement that is an 'insured contract' provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement."

¶ 71    The policy defined "insured contract" as:

"That part of any other contract or agreement pertaining to your garage business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for 'bodily injury'

or 'property damage' to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."

¶ 72    Construing the policy before us, it is clear that the contract between ACG and ACT falls within the definition of an "insured contract." The agreement between ACT and ACG required ACT to assume ACG's tort liability in the event of bodily injury or property damage to a third party.

¶ 73    Plaintiff argues that this exception does not apply to the instant case because plaintiff never agreed to be bound by such an agreement and, in particular, never agreed to indemnify ACT for legal fees or other expenses outside of its tort liability. But that argument is undercut by *La Grange*, which dealt with comparable policy language. There, an insured physical therapy provider agreed to indemnify a hospital for workman's compensation liability or other liability related to claims made by hospital employees. *La Grange*, 317 Ill. App. 3d at 866-67. The insurance policy at issue covered claims for bodily injury and property damage that the physical therapy company was legally required to pay as damages but also agreed to protect any entity that the insured company had contracted with " 'to provide the kind of protection' " offered by the policy. *Id.* at 867. We rejected the insurer's argument that the policy did not cover the hospital because the policy specifically contemplated that the insured would be entering into contracts with third parties and that the insurer would be obligated to protect them. *Id.* at 870.

¶ 74    While the policy language here is different, it nevertheless also contemplated coverage for third parties with which ACT agreed to protect. The policy stated that it would cover losses sustained by ACT for bodily injury or property damage and excludes contractual liability except for those damages that are assumed through an insured contract, and the only limitation stated in

the policy is that the bodily injury or property damage must occur after ACT entered into the insured contract. Like *La Grange*, the policy contemplated that ACT might enter into agreements with other third parties. See *id.*; see also *Altevogt v. Brinkoetter*, 85 Ill. 2d 44, 55-56 (1981) (it is unnecessary that a contract for the benefit of a third-party beneficiary identify him by name; the contract may define the party benefitted by class description). When plaintiff issued its policy, it contained an agreement that it would cover ACT for liability assumed as part of an insured contract. Subsequent to obtaining that insurance policy, ACT entered into just such an insured contract in which it agreed to assume ACG's tort liability that would be imposed by law absent an agreement. Plaintiff's policy was issued to ACT at least as early as September 22, 2013, and the contract between ACG and ACT did not become effective until June 6, 2014, which was prior to the incident between Galbraith and Sanchez. As defendant notes, nothing in the policy required plaintiff to authorize or consent to the insured contracts into which ACT might enter.

¶ 75 Plaintiff also argues that the indemnity contract between ACT and ACG expanded plaintiff's liability to include attorney fees. But none of the policy exclusions exclude coverage in this way—exclusions that plaintiff could have added. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 117 (1992) (if an insurer desires to restrict coverage in particular ways, it can add specific exclusions to that effect).

¶ 76 Plaintiff further argues that it was not required to indemnify ACT because ACT violated the policy's provision that forbade it from making any payments without plaintiff's consent. Courts have referred to these types of provisions as "voluntary payments," which provide that an insurer will not be held responsible for its insured's voluntary payments incurred before tendering the defense of the lawsuit. *Myoda Computer Center, Inc. v. American Family Mutual Insurance Co.*,

- 21 -

389 Ill. App. 3d 419, 422 (2009). But ACT did not make such a voluntary payment, so it could not have violated that policy provision. ACG settled with Galbraith, and ACT was contractually obligated to indemnify ACG. ACT only indemnified ACG for the loss, which is something expressly provided for in the policy. Plaintiff's argument that it tried to enter the underlying tort case and object "but was rebuffed" carries little weight. A review of the record shows that on November 4, 2019, plaintiff's counsel appeared on behalf of plaintiff during a hearing on Galbraith's underlying tort suit. There, plaintiff's counsel attempted to object to the trial court's jurisdiction to "enter findings that affect the dec[laratory] action about what this case was about which we dispute." However, plaintiff's brief neglected to mention that counsel was "rebuffed" because he came to a hearing where he had no standing, had not filed an appearance, *and* had not filed a petition to formally intervene in the case.

¶ 77    Finally, plaintiff insists that there was no duty to indemnify because there was no trial. Plaintiff writes that per the policy, "the duty to pay doesn't exist until 'the amount of that obligation has finally been determined by judgment after trial.' " Plaintiff appears to suggest that insurance coverage does not exist until there has been a trial and judgment entered on the outcome of that trial. This is yet another example of plaintiff distorting facts in a way the record cannot bear.

¶ 78    Plaintiff's quote, taken entirely out of context, comes from a section in the policy labeled "Legal Action Against Us," which states:

"No one may bring a legal action against us under this coverage form until:

a)   There has been full compliance with all the terms of this coverage form; and

b)   Under Liability Coverage, we agree in writing that the 'insured' has an obligation

to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the 'insured's' liability."

¶ 79    Examining plaintiff's quoted language in the context of the words around it, we fail to see what this provision has to do with the case at hand. Nowhere in the quoted passage does the policy state that plaintiff's duty to pay for a loss only arises after a trial. This provision only addresses when an action can be brought against plaintiff to determine an insured's liability.

¶ 80    Nothing in plaintiff's argument persuades us that the trial court erred in finding that plaintiff had a duty to indemnify ACT. We agree with the trial court that the agreement between ACG and ACT was an insured contract as defined in the policy.

¶ 81                                    C. Additional Considerations

¶ 82    Having disposed of plaintiff's arguments and determined that the trial court's judgment should be affirmed, we are compelled to seize upon multiple additional aspects of the briefing in this case that range from perplexing to outright disconcerting.

¶ 83    First, although we have commented multiple times throughout this opinion on plaintiff's tenuous relationship with facts, the briefing is replete with examples—too many to summarize— of plaintiff misstating or contorting facts. However, one particular example warrants special mention. Plaintiff repeatedly accused the defendants of colluding with each other to fabricate the underlying settlement to incur insurance coverage. For example, at one point plaintiff claims that ACG, ACT, and Galbraith, "collusively cooked up a 'settlement.' " Each time these accusations were made, they were unaccompanied by any citation to the record. Plaintiff did not point to a single line of deposition testimony, or a single sentence of an affidavit, or any evidence

whatsoever, that would permit even a wild, inferential leap to such a conclusion. It should go without saying that this sort of conduct is unacceptable. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires reference to the pages in the record on appeal where evidence for factual claims may be found. This is true in all circumstances, and statements unsupported by citation may be disregarded. *Holmstrom v. Kunis*, 221 Ill. App. 3d 317, 325 (1991). But the rule is that much more critical when one party begins hurling accusations of conduct that could potentially constitute professional misconduct or worse. Baseless accusations find no purchase with us, and we expect attorneys who practice before us to avail themselves of those pesky things known as facts.

¶ 84     Second, we must take a moment to comment on a section of plaintiff's brief that was as befuddling as it was alarming. In its attempt to argue that the policy's notice provision was breached, plaintiff claimed that: "The fact reading the deposition one may presume [Khairallah] spoke with an accent is hardly a basis to presume he didn't know his driver battering a customer would not come back to haunt him."

¶ 85     Having read the deposition in question, we have tried, and failed, to imagine a way in which whether Khairallah speaks with an accent has even the slightest relevance to ACT's compliance with the policy's notice provision. At best, this comment is worded exceptionally poorly and has no conceivable place among these facts or legal issues. At worst, it is laced with insidious, nonsensical insinuations that are unacceptable. We are also disturbed by counsel's suggestion that we may *presume* that Khairallah speaks with an accent based on a cold record. Based on what? Surely not his name—which plaintiff misspelled repeatedly. What counsel truly intended with this comment is beyond us, but this is as good a time as any to remind litigants that civility, professionalism, and tolerance are nonnegotiable.

¶ 86    This case exemplifies exactly how and why words matter. Just as swiftly as they can carry litigants to the relief they seek, they can also decimate credibility.

¶ 87                                    III. CONCLUSION

¶ 88    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 89    Affirmed.

*Stonegate Insurance Co. v. All City Towing, Inc.*, **2024 IL App (1st) 221769**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CH-7627; the Hon. Celia G. Gamrath and Thaddeus L. Wilson, Judges, presiding. |
| **Attorneys for Appellant:** | Samuel A. Shelist, of Shelist LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Richard T. Valentino and Michael Resis, of Amundsen Davis, LLC, of Chicago, for appellee Auto Club Group. |
| | No brief filed for other appellees. |